FILED
2013 Sep-24  PM 03:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **KIMBERLY NEWMAN** | ) | |
| **WEATHERINGTON,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **2:12-CV-02277-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE** | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On November 21, 2008, the claimant Kimberly Newman Weatherington applied for a period of disability and disability insurance benefits under Title II of the Social Security Act and supplemental security income under Title XVI of the Social Security Act. (R. 130, 137). The claimant alleged disability beginning on October 2, 2008, because of mental and emotional disorders. (R. 130, 190).  The Commissioner denied the claim on February 2, 2009. The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on September 23, 2010. In a decision dated October 7, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act and thus was ineligible for disability and disability benefits and supplemental security income. (R. 24)  The claimant filed a timely request for review of that decision to the Appeals Council on October 22, 2010. On May 4, 2012, the Appeals Council granted the claimant's request for review and issued a decision

denying the claimant's application for disability and disability benefits and supplemental income. (R. 6). The Appeals Council adopted all of the ALJ's conclusions but disagreed with the ALJ's finding regarding the claimant's ability to perform her past relevant work. (R. 5). As a result, the decision of the Appeals Council became the final decision of the Commissioner of the Social Security Administration. (R. 4-7). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405 (g) and 1383 (c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review: (1) whether the ALJ provided a proper credibility finding for the claimant's subjective complaints; and (2) whether the Appeals Council erred in adopting the ALJ's finding regarding the claimant's disability.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Brown*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluation claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker,* 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirely and take into account any evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which as lasted or can be expected to last for a continuous period of not less than 12 months." To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1)    Is the claimant presently unemployed?
> (2)    Is the claimant's impairment severe?
> (3)    Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)    Is the claimant unable to perform his or her former occupation?
> (5)    Is the claimant unable to perform any other work within the national economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

When evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and either (1) objective

medical evidence that confirms the severity of the alleged symptoms arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged symptom. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. §404.1529. A claimant's subjective testimony supported by medical evidence is itself sufficient to support a finding of disability. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1992). The ALJ must articulate reasons for discrediting the claimant's subjective testimony. *Brown v. Sullivan*, 921 F.2d.1233, 1236 (11th Cir. 1991). If the ALJ does not articulate his reasons for discrediting the claimant's testimony, then the court must accept that testimony as true. *Id.*

Next, if the claimant has a severe impairment that does not equal or meet the severity of a listed impairment, the examiner proceeds to the fourth step and assesses the claimant's residual functional capacity (RFC). This assessment measures whether a claimant can perform past relevant work despite his or her impairment. 20 C.F.R. §404.1520(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).

To support a conclusion that the claimant can to return to her past relevant work, the ALJ must consider all the duties of that work and evaluate the claimant's ability to perform them in spite of her impairments. *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990); *see also Cannon v. Bowen*, 858 F.2d 1541, 1545-46 (11th Cir. 1988) (remanding to the Commissioner to determine whether claimant's past work included prohibited activities).  Where the record is inconclusive as to the claimant's residual functional capacity, however, the record must be further developed through vocational expert testimony. *Holladay v. Bowen*, 848 F.2d 1206, 1210 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131-32 (11th Cir. 1986). The ALJ must

4

consider whether the claimant held the job within the past fifteen years; whether the job counts as substantial gainful activity; and whether the claimant learned to do the work. 20 C.F.R. § 416.960(b)(1). The claimant has the burden to produce evidence in support of her claim. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2007).  Also, the claimant must prove that she cannot perform her past relevant work. *Jackson v. Bowen*, 801 F.2d 1291, 1293 (11th Cir. 1986).

## V. FACTS

The claimant has a high school education and was thirty-one years old at the time of the hearing. (R. 183, 48). She has past work experience as a patient care tech and welder. (R. 191). The claimant alleges that she was disabled by mental and emotional disorders beginning on October 2, 2008. (R. 190).

*Mental Limitations*

On February 8, 2005, the claimant sought treatment at Eastside Mental Health Center for depression and anxiety. (R. 373). The claimant reported panic attacks and serious suicidal thoughts. The claimant also reported that she had a history of depression, that she had previously suffered a drug overdose, and that she self-medicated with marijuana. Medical personnel documented that the claimant worked as a welder up to ten hours a day and attended school at night. Medical personnel documented that the claimant allegedly did not sleep as a result of her mental conditions. (R. 377). Therapist Nancy Mitchell scheduled an appointment for the claimant with Dr. Stone, an Eastside Mental Health physician, for March 28, 2005. Dr. Stone diagnosed the claimant with bipolar I, ADHD, and anxiety. (R. 372).[1]

---

[1]The record contains no record of the claimants visit with Dr. Stone in the record. However, the claimant's progress note in March 2008 indicates that Dr. Stone diagnosed the claimant with these conditions. (R. 372).

On June 9, 2006, Trinity Medical Center emergency medical staff evaluated the claimant in the emergency room. The claimant arrived via paramedics and reported that she attempted suicide from an overdose of her anxiety medicine and narcotics. (R. 326). Dr. David S. Harvey, M.D., conducted a mental status exam, and the claimant denied suicidal or homicidal ideations. Dr. Harvey discharged the claimant with no additional medication and instructed her to follow up with East Side Mental Health Center. (R. 324).

On February 28, 2008, medical personnel at Eastside Mental Health Center conducted a mental evaluation of the claimant and found that the claimant demonstrated appropriate appearance; cooperative demeanor; normal speech; motor function within normal limits; euthymic mood; full range-mood congruent affect; anxiety; and goal directed thought process. (R. 255). Medical personnel found the claimant's symptoms to be mild-moderate, but noted that the claimant did not comply with previous treatment recommendations. Medical personnel assigned the claimant a diagnostic impression of bipolar II, cannabis abuse, and a GAF score of 55.

On March 31, 2008, the claimant sought outpatient treatment for depression and anxiety from Eastside Mental Health Center after two years of absence. (R. 372). Dr. Romaine Hain, M.D. assessed the claimant and documented her condition as bipolar I,  ADHD, and S/P BTL. The claimant continued to receive outpatient therapy from Eastside Medical Center on March 31, 2008; July 2, 2008; September 11, 2008; November 10, 2008; January 7, 2009; April 10, 2009; and June 3, 2009. (R. 366-372). During these visits, the claimant reported a history of depression but also stated that she wanted to be able to control her feelings and pursue a career. (R. 282, 291). The claimant continued to take carbamazepine, lithium carb, alprazolam, propanalol,

6

trazadone, and buspirone for depression and anxiety. (R. 366-372).

On October 16, 2008, Dr. Ross M. Vander Noot, treated the claimant in the emergency room for mood swings and headaches. Dr. Vander Noot noted a history of depression. Dr. Vander Noot also noted that the claimant stated she was taken off depokote, and placed on lithium, which the claimant believed to be the cause of her complaint. Dr. Vander Noot noted that the claimant was goal directed during the visit and also articulated that "perhaps what [the claimant] is really looking for is for someone to put her back on her depakote and this may in fact be a bargaining technique." (R. 320).

On November 10, 2008, the claimant reported to Dr. Hain that her mood was "more even" since her last emergency room visit. (R. 332). Dr. Hain noted that the claimant was non-psychotic and non-suicidal during the visit.

On December 10, 2008, Dr. Rusheng Zhang, M.D. treated the claimant as a psychiatric inpatient for recurrent bipolar disorder, depression with psychotic feature, and reported suicidal ideation with a plan to overdose. The claimant reported that the loss of her job and financial difficulties caused the suicidal episode. Dr. Zhang ordered an MRI of the claimant which showed normal results. (R. 345). After a two day stay, Dr. Zhang noted that the patient improved and discharged the patient, at her request, with a plan for the claimant to continue her outpatient therapy. (R. 347-48). At the next outpatient visit on June 3, 2009, Dr. Hain, her psychiatric treating physician, noted that the claimant reported that her mood and anxiety had both improved. (R. 281).

The claimant did not attend or canceled her individual outpatient therapy sessions on August 3, 2009; November 10, 2009; November 12, 2009; and December 10, 2009.  The

claimant, however, attended therapy sessions on January 14, 2010, and February 17, 2010. (R. 235-248).

On January 22, 2009, Dr. Carol Walker, a consulting neuropsychologist, met with the claimant and evaluated the claimant's condition. Dr. Walker diagnosed the claimant with bipolar disorder type II and cannabis use. Dr. Walker noted that the claimant had a history of depression and used cannabis once a week beginning at the age of twelve. (R. 356). Dr. Walker found, however, that the claimant's sensory skills, gait, balance, and coordination were unimpaired. Dr. Walker also concluded that the claimant's cognitive skills were estimated to fall in the average range; noted that the claimant's capacity to understand and follow instructions and receive supervision were also unimpaired; that there was no evidence of mental slowing; and that the claimant exhibited appropriate social skills during the evaluation.  Dr. Walker found that the claimant's mental impairment was moderate in severity, and was partially controlled with medication. (R. 358).

Dr. Walker also noted that the claimant last worked on October 25, 2008, and was fired for being late and making errors. Dr. Walker also noted that the claimant's speech was fluent and well articulated. Dr. Walker indicated that the claimant stated she was independent with her activities of daily living including household tasks; she was unable to cook, but prepares frozen food for her family; and that her social interaction is limited to talking on the phone, visiting with her sister, and engaging in family activities.

On January 30, 2009, Dr. Guendalina Ravello, Ph.D., completed a mental residual functional capacity assessment. Dr. Ravello found that the claimant was not markedly limited in any category; that the claimant had no significant limitations with her understanding and

memory; and that her adaptation to changes in work setting should be presented gradually and infrequently to give time for adjustment. Dr. Ravello also found that the claimant was able to concentrate and attend to simple tasks for two hours and would need all customary rests and breaks; that the claimant worked best in a well-spaced environment with a few familiar co-workers to minimize stress and distractions, but that she could tolerate ordinary work pressures; and that the claimant should avoid excessive workloads, quick decision making, rapid changes and multiple demands. Dr. Ravello also concluded that the claimant's contact with the public and co-workers should be casual and that feedback towards the claimant should be supportive, tactful, and non-confrontational. (R. 302). Ultimately, Dr. Ravello's medical summary determined the claimant had an affective disorder and a substance addiction disorder. (R. 304).

On February 2, 2009, Dr. Robert H. Heilpern, M.D. reviewed the objective medical evidence and completed a physical summary. The claimant's record indicated that she reported that she had tremors, headaches, and shakes. Dr. Heilpern noted that the claimant noted no other physical problems beyond those associated with tremors. (R. 318). Dr. Heilpern also noted that during her 2008 hospital stay, Dr. Zhang documented that she had no tremors or shakes during the physical exam. Further, Dr. Heilpern noted that the claimant's MRI showed no sensory deficits. (R. 318). Lastly, Dr. Heilpern concluded that the claimant was partially credible and that her headaches were not severe.

On March 11, 2010, Dr. Armand Schachter, M.D., admitted the claimant for depression and suicidal overdose of lithium. (R. 258).  The claimant received psychiatric treatment and services, and Dr. Schachter transferred the claimant to psychiatric services under the care of Dr. Harvey. (R. 271). After three days, the claimant checked herself out against medical advice. (R.

260).

On April 1, 2010, Eastside Mental Health Center developed a new outpatient treatment plan for the claimant. Licensed Mental Health Professional Judy Moore noted that the claimant had not been compliant with her therapy sessions but noted that the claimant wanted to comply with her medications and appointments. Ms. Moore documented that the claimant had recently relapsed with an overdose of lithium; had goals to maintain consistency in her treatment plan and to receive social security disability so that she could provide for her family; stated that she was sexually abused as a child and had severe mood swings, crying spells, and low energy as a result of her depression and anxiety; and that she had violent outbursts of damaging property, hypersexual activity, extreme multi-tasking, and over-spending. (R.361).

## The ALJ Hearing

The Commissioner denied the claimant's application for disability and disability insurance benefits on February 3, 2009. (R. 78). The claimant requested a hearing before an ALJ, and the ALJ held the hearing on September 23, 2010. (R. 46).

The claimant testified that her disability resulted from emotional and psychological problems. The claimant stated that she was not currently working because of medical issues and doctors' appointments related to her emotional and psychological problems. The claimant testified that her therapist was Nancy Mitchell and that her treating physician was Dr. Hain. (R. 56).

The claimant stated that she was hospitalized in 2008 because of a manic state that was a result of a new drug combination. The claimant testified that she jumped out of a car and had a lot of rage. The claimant stated that the main problems that prevented her from working were

bipolar disorder, uncontrollable moods from manic depression, and anxiety. (R. 49-50). The claimant stated that she has never felt regulated for more than two or three months at a time and that she goes up and down on a daily basis.

The claimant also testified that she did not comply with her prescribed medication plan because she felt sleepy or lethargic and could not "operate." (R. 51). The claimant stated that the reasons for her hospitalizations were because of suicide attempts or sheer confusion. The claimant stated that her behavior is irrational and that she is a threat to herself.

The claimant reported that she had difficulty concentrating and staying focused. (R. 52). The claimant testified that the lithium slowed down her change in mood and allowed her to realize that her depression was worsening. (R. 53). The claimant stated that she attempted to brace herself and make better decisions while she is in a manic state. The claimant testified that her symptoms were crying a lot; thinking intensely about bad things; and having more suicidal thoughts. The claimant testified that she did not think the lithium had any effect on her depressive states but that it did slow them down and provided longer periods in between the depressive and manic states. (R. 54).

The claimant next stated that she had visual hallucinations "all the time." (R. 55). She stated that she did not take anything to control her hallucinations but that she did not want to take Haldol, a drug prescribed for hallucinations, because she had seen other patients on Haldol appear to be "really, really, really out of it." (R. 55). The claimant testified that she used marijuana inconsistently but never had a drug addiction; that she self medicated with marijuana in the past; and that she may have smoked once a week during the time she attended therapy. (R. 63).

11

The claimant testified that she has three children, ages thirteen, eleven, and nine. The claimant stated that she was involved at her children's school, attended parent teacher association meetings, chaperoned field trips, and did whatever the teacher may need her to do. (R. 64). The claimant testified that she attended her children's football games every Saturday morning.

The claimant stated that she tried to be extra attentive towards her children. She reported that she naps for two hours a day as a side effect of her medication. The claimant stated that she was nominated to be the president of her son's little league team but resigned from the position because she could not fulfill her duties. She stated that she could not deal with the people, the sponsorship, or the organization regarding different responsibilities. She testified that she could not stay focused or put appropriate tasks in order without making mistakes. (R. 59). The claimant stated that she had a history of headaches that lasted up to four days. The claimant stated that while a beta blocker had helped her in the past, it was too expensive for her to take and that the lithium she took contradicted the beta blocker.

The claimant reported that she stopped taking depakote, despite helping control her symptoms, because of side effects including what she referred to as "hormonal tremors." (R. 61). The claimant then stated that she also had a lot of problems trying to work while taking depakote — problems with concentration, impulses, and mood swings. The claimant testified that depakote gave her a "nice time of resting" where she "felt regulated," but that she had occasional "extreme" episodes.

The claimant stated that she lives with her mother and did not drive "much at all." (R. 65). The claimant testified that she was looking for a job as a certified nursing assistant, medical assistant, unit secretary, or unit clerk and that she lost her previous job because she was late due

12

to anxiety.

The ALJ then examined Mr. Claude Peacock, the vocational expert. Mr. Peacock testified that the claimant had previous work experience as a patient care tech, patient screener, and unit clerk and that these jobs were classified as light and semi-skilled, sedentary and semi-skilled, and light and semi-skilled, respectively.

The ALJ then asked Mr. Peacock if a hypothetical individual with the claimant's same age, education, and work history and with no exertional limitations could perform the claimant's prior work. The ALJ instructed Mr. Peacock to assume the following limitations for the hypothetical individual: could attend to simple tasks for two-hour periods of time; would work best in a well-spaced environment with a few familiar coworkers; could tolerate ordinary work pressures; and would avoid excessive workloads, quick decision-making, rapid changes, and multiple demands. Further, the ALJ instructed Mr. Peacock to assume that the hypothetical's contact with the public and co-workers would be casual; feedback would be supportive; and changes in the work setting should be infrequent and gradually presented. Mr. Peacock stated that he believed that the positions of a patient care tech and a patient screener were within that criteria. (R. 67).

Mr. Peacock also testified that many other jobs were available based on a classification of positions that are light and unskilled. Mr. Peacock provided as examples an electrical line worker and wrapper tender. Mr. Peacock further testified that these positions existed in significant numbers in both the national and state economy. (R. 68).

The claimant's attorney then questioned Mr. Peacock about a hypothetical worker with the same limitations as the ALJ discussed above. The claimant's attorney provided the additional

13

limitations that the worker would be absent from work for two or more days a month due to

psychological symptoms, headaches, or side effects from medication, and would be unable to

maintain concentration, persistence, and pace for a two hour period during an eight hour day. Mr.

Peacock testified that these jobs would not permit such a requirement.

*The ALJ Decision and the Appeals Council Decision*

On October 7, 2010, the ALJ issued a decision finding that the claimant was not disabled

under Sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act and denied her

application for a period of disability and disability benefits and supplemental security income.

(R. 16). Before announcing his findings of fact, the ALJ described in great detail the five-step

sequential evaluation process that would be the basis of her analysis. (R. 17).

First, the ALJ found that the claimant met the insured status requirement of the Social

Security Act through March 31, 2010. The ALJ found that the claimant had engaged in no

gainful employment since October 2, 2008, the alleged onset date of her disability.

Next, the ALJ found that the claimant had a severe impairment of bipolar disorder.

Although the evidence supported a finding of the claimant's impairment, the ALJ found that the

claimant's disorder was not an impairment that met one of the listed impairments and was not

disabling. The ALJ noted that the claimant testified that she had occasional headaches but that no

treating physician or other medical source stated that the claimant's headaches caused disability.

The ALJ concluded that the claimant's mental impairment did not satisfy listing 12.04

"paragraph B" criteria, finding that the claimant has only a mild restriction in her activities of

daily living and was able to live independently and care for her three children. The ALJ noted

that the claimant had moderate difficulty functioning socially but that her consultative

14

examination indicated that she spoke on the phone with her family, visited her sister, and engaged in family activities. The ALJ also noted that the claimant had moderate difficulty in concentration, persistence or pace, and had anxiety in social situations.  The ALJ found that the claimant's record indicated no significant, sustained loss of adaptive functioning. (R. 19).

Similarly, the ALJ evaluated the "paragraph C" criteria and found that the evidence failed to establish the presence of such criteria because no evidence exists that established repeated episodes of decompensation; propensity toward decompensation; need for a highly supportive living arrangement; or inability to function independently outside of her home. (R. 19).

The ALJ then undertook a more detailed analysis to determine the claimant's residual functional capacity (RFC), and noted that the criteria identified in paragraphs B and C above require a lesser assessment. The ALJ found that the claimant had a RFC to perform a full range of work at all exertional levels with the following limitations: can concentrate and attend to simple tasks for two hour periods of time; will work best in a well-spaced environment with a few familiar coworkers; can tolerate ordinary work pressures and demands; should have casual contact with the public and co-workers; should receive supportive feedback; and changes in the work setting should be infrequent and presented gradually.

In making the finding, the ALJ considered all symptoms and the extent to which objective medical evidence and opinion evidence supported those symptoms. The ALJ noted that the claimant's testimony that related to ups and downs was not supported by evidence in the record. Further, the ALJ noted that the claimant stated that her medication slows down the process and allows her to realize that a manic or depressive episode is coming. The ALJ also considered that the claimant chose not to take medication for her hallucinations, had not been compliant with her

15

medication when she was hospitalized in 2008, and self medicated with marijuana.

The ALJ articulated that when the claimant was initially treated at Eastside Mental Health Center earlier in 2008, the claimant exhibited appropriate appearance; cooperative demeanor; normal speech; a euthymic mood; full range-mood congruent affect; anxiety; goal directed thought process; and motor function within normal limits. The ALJ noted that the claimant's symptoms were classified as mild to moderate and that she was non-compliant with treatment. The ALJ noted that after a few months of treatment, the claimant reported that her moods were more stable, her racing thoughts were better, and that her concentration and anxiety had improved. Lastly, when hospitalized for a suicide attempt, the claimant requested to go home because she reportedly felt better and denied being suicidal. (R. 21).

The ALJ next articulated that in January 2009, Dr. Hain noted that the claimant had been hospitalized for suicidal ideations but that the claimant reported no longer feeling depressed and being less stressed. Also, the ALJ documented that the claimant underwent a consultative examination during that time. The claimant exhibited no signs of sleep deprivation despite reporting that she was getting very little sleep. The ALJ noted that Dr. Walker found that the claimant was fully oriented; had well-maintained attention and concentration; had no observed deficits in memory; had knowledge estimated to fall in the average range; had abstract unimpaired thoughts; had logical and goal directed thought processes; had no symptoms of perceptual distortions or thought disorder; and had good judgment and insight. (R. 21).

Next, the ALJ noted that the claimant stated that she was independent in all of her activities of daily living and household tasks and that she cared for her three children, prepared frozen meals, helped them with homework and got them ready for bed.  The ALJ considered that

16

Dr. Walker noted that the claimant's symptoms appeared to be partially controlled with medication and that treatment in the past led to an improvement in her conditions over periods of time. Lastly, the ALJ noted that Dr. Walker concluded that the claimant's mental impairment was moderate in severity. (R.21).

The ALJ next considered that in April 2009, Dr. Hain noted that the claimant was back on her medication with a stable mood and that the claimant reported her medications were well tolerated. The ALJ noted that the claimant's symptoms improved after she took her medications regularly for a week in June of 2009. The ALJ also noted that the claimant failed to show up for her therapy session in August 2009 and later that month reported mild symptoms of depression. Again, the ALJ noted that the claimant had been noncompliant with her medication. However, the ALJ documented that the claimant indicated that she was trying to be more compliant with her medications, but again did not attend her therapy appointments in November and December 2009.

The ALJ then considered that the claimant returned to Eastside Mental Health Center in January 2010 and underwent group therapy and individual therapy in February 2010. Again, the ALJ documented that the claimant reported being noncompliant with her medications and also reported that she had not seen Dr. Hain in almost one year. The ALJ noted that the claimant was again hospitalized in March 2010 for suicidal thoughts, and afterwards sought treatment again at Eastside Mental Health Center. The ALJ found that the therapist not only noted that the claimant had been non-compliant for the last several months but also that the claimant checked herself out against medical advice after three days. The ALJ also noted that the claimant complained of mood swings, violent spurs, and hallucinations since being non-compliant.

17

The ALJ discounted the claimant's statements concerning intensity, persistence, and limiting effects of those symptoms. The ALJ concluded that, although the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms, her statements were not credible to the extent that they were inconsistent with the claimant's RFC assessment and objective medical evidence. The ALJ noted that contrary to the claimant's testimony, her moods and symptoms were under fair control when she was compliant with her medication. Further, the ALJ noted that the claimant had reported that her mood was good and more stable with improved symptoms as long as she was taking her medication regularly. The ALJ found that the claimant's failure to take her medicine caused the most recent hospitalization. The ALJ concluded that the claimant may have some mild to moderate limitations due to her bipolar disorder and that those limitations are fully accounted for in the claimant's RFC.

The ALJ gave significant weight to the opinion of the state agency psychological consultant, Dr. Guendalina Ravello, Ph.D. The ALJ noted that, although Dr. Ravello did not examine the claimant, she provided specific reasons for her opinion about the claimant's mental functioning and supported her reasons with evidence in the record. The ALJ also noted that Dr. Ravello's opinion was internally consistent with the objective medical evidence as a whole. Lastly, the ALJ considered that Dr. Ravello was familiar with the disability program of the Social Security Administration and that she has a good understanding of the requirements that must be met to establish disability.

The ALJ next gave significant weight to the opinion of the state agency medical consultant, Dr. Robert H. Heilpern, M.D., emphasizing that his opinion was consistent with the medical evidence in the record as well as the evidence as a whole.

18

Next, the ALJ gave substantial weight to the consultative examiner, Dr. Carol Walker, Ph.D. The ALJ noted that Dr. Walker directly observed and examined the claimant; reviewed the claimant's entire medical and psychological history; and had a significant basis for her determinations. The ALJ also found that Dr. Walker's findings were consistent with the evidence as a whole; they were objectively determined; they were uncontradicted by other evidence; and thus, were entitled to substantial weight. However, the ALJ concluded that the claimant was slightly more limited than determined by Dr. Walker.

The ALJ then found that the claimant was capable of performing her past relevant work as a patient care technician and a patient screener. The ALJ concluded that these positions do not require performance of work-related activities that are precluded by the claimant's RFC.  The ALJ compared the claimant's RFC with the physical and emotional demands of this work and concluded that the claimant could perform this work as actually and generally performed. The ALJ also noted that the vocational expert affirmatively responded to the question about whether the claimant could perform the work with her RFC.

On May 4, 2012, the Appeals Council for the Social Security Administration issued a decision after review of the ALJ's determination. The Appeals Council adopted the ALJ's findings regarding the provisions of the Social Security Act; Social Security Administration Regulations; Social Security Rulings and Acquiescence Rulings; the issues in the case; and the evidentiary facts. The Appeals Council also adopted the findings and conclusions regarding whether the claimant was disabled.

However, while the Appeals Council agreed with steps 1, 2, and 3 of the ALJ's sequential evaluation, it did not agree with the ALJ's finding that the claimant is capable of performing her

past relevant work. The Appeals Council found the claimant's past relevant work to be at a higher skill level than the claimant's RFC and also found that it was unclear whether the claimant ever performed this work at the substantial gainful activity level. The Appeals Council reasoned that the claimant's prior work was at a semi-skilled level but the claimant's RFC is for unskilled, light work. Further, the Appeals Council noted that the claimant's earnings record indicated that she had not worked at the substantial gainful activity level on a yearly basis, which made unclear whether these jobs qualified as the claimant's past relevant work.

The Appeals Council then stated that because the claimant could not perform her past relevant work, the Commissioner had the burden to show that other jobs exist in significant numbers in the national economy that the claimant can perform given her RFC, age, education, and work experience. The Appeals Council found that given the claimant's limitation criteria as provided by the ALJ, the vocational expert testified that two light and unskilled jobs exist that do not conflict with the claimant's RFC: electrical equipment assembler and wrapper tender. In reliance on the testimony of vocational expert, the Appeals Council concluded that the claimant had not been disabled as defined in the Social Security Act at any time through October 7, 2010.

## VI. DISCUSSION

1. *The ALJ properly discounted the credibility of the claimant's subjective testimony*

The claimant alleges that the ALJ failed to provide a proper credibility finding as required by Social Security Ruling 96-7p.  This court finds that the ALJ properly discounted the claimant's subjective testimony by referring to objective medical evidence that is contrary to the claimant's alleged symptoms.

When a claimant attempts to establish her disability through testimony of subjective

symptoms, the Eleventh Circuit pain standard applies. The pain standard requires a showing of:

> (1) evidence of an underlying medical condition; *and either*
> (2) objective medical evidence that confirms the severity of the alleged symptom arising from the condition *or*
> (3) that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain or symptom.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (emphasis added); *see also Holt*, 921 F.2d at 1223. Pain and other symptoms alone can be disabling, and in some circumstances a claimant's subjective testimony, supported by medical evidence that satisfies the standard, can be sufficient to support a finding of disability. *Foote*, 67 F.3d at 1561. The ALJ is not required to recite the standard verbatim, but must make findings consistent with a correct application of the standard. *See Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). When the ALJ decides to discredit the claimant's testimony of symptoms, he must do so explicitly, and with adequate reasons. *Id.*

In his decision, the ALJ correctly applied the Eleventh Circuit's standard to the facts in this case. The ALJ found that the claimant did have medically determinable impairments that could reasonably be expected to cause the claimant's symptoms. The ALJ, however, properly discredited the claimant's personal testimony as being against the great weight of medical evidence in the record. Although the claimant identified bipolar disorder as her disabling condition, the ALJ articulated that the claimant's records reflect that her moods and symptoms improve when she is compliant with her prescribed medications. The ALJ further noted that the claimant displayed symptoms that were classified as mild to moderate when evaluated at Eastside Mental Health Center. The ALJ noted that the claimant's consultative examination did not exhibit behavioral evidence of sleep deprivation, and moreover, exhibited that the claimant was

fully oriented with logical and goal-directed thought processes. The ALJ noted that no evidence of perceptual distortions or thought disorder exists, and that the claimant's judgment and insight were good.

The ALJ referred to the claimant's activities of daily living and noted that the claimant acknowledged that she was independent with household tasks. The ALJ found that the claimant was able to care for her three children; prepare meals for her children; help her children with her homework; and bathe and put her children to bed.

Identifying specific portions of the medical record, the ALJ also found that Dr. Walker noted that the claimant's symptoms were partially controlled with medication and that treatment in the past led to an improvement in her condition over periods of time. The ALJ properly articulated explicit, adequate reasons to discredit the claimant's subjective testimony. Also, the ALJ properly discredited the claimant's testimony by weighing both the medical findings of the state psychological consultant, the state agency medical consultant, and the consultative examiner, against her personal testimony. Thus, the ALJ correctly applied the Eleventh Circuit's standard, and substantial evidence supports his findings.

### 2. ALJ's past relevant work determination

Next, the claimant argues that the ALJ failed to consider the mental demands of the claimant's past relevant work as required. Past relevant work is any job that the claimant held within the past fifteen years that generated substantial gainful activity and that the claimant learned to do. 20 C.F.R. § 416.960(b)(1). The claimant has the burden to produce evidence to support her claim and specifically bears the burden to prove that she cannot perform her past relevant work. *Ellison*, 355 F.3d at 1276; *Jackson*, 801 F.2d at 1293.  Once a claimant has

established that she has no past relevant work or cannot perform her past relevant work because of her impairment, the burden of proof shifts to the Commissioner to show that other jobs exist in significant numbers in the national economy that the claimant can perform.

The Commissioner concedes that the ALJ erroneously stated in his decision that the claimant could perform her past relevant work. The court notes that the ALJ determined that the claimant was able to perform past relevant work, and the Appeals Council reviewed the decision and disagreed. However, despite the ALJ's conclusion regarding the claimant's past relevant work, the Appeals Council adopted the ALJ's finding as to the claimant's disability. The Appeals Council based its decision on the vocational expert, Mr. Peacock's, testimony that the claimant could perform other unskilled and light positions given her limitations. Thus, the Commissioner satisfied the burden of showing that other jobs exist that the claimant can perform. The court finds that the Appeals Council correctly relied on the vocational expert's testimony in accordance with the proper legal standard.

## VII. CONCLUSION

For the reasons stated, this court finds that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED. The court simultaneously will enter a separate Order to that effect.

DONE and ORDERED this 24th day of September, 2013.

_Karon O. Bowdre_
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

23